| | |
|---|---|
| **IN THE MATTER OF ARBITRATION** ) | **MARVIN HILL** |
| ) | **ARBITRATOR** |
| **BETWEEN** ) | |
| ) | **(MSG) DANIEL J. FORTNEY** |
| **AT&T MIDWEST** ) | **GRIEVANT** |
| ) | |
| **AND** ) | **ISSUE: DISCHARGE** |
| ) | |
| **COMMUNICATION WORKERS OF** ) | **HEARING DATE: NOVEMBER 12** |
| **AMERICA, LOCAL UNION 4340** ) | **(MOVED TO NOVEMBER 17, 2020)** |
| ) | **CLEVELAND, OHIO** |

### APPEARANCES

For the Employer:    Littler & Mendelson, P.C., by
Steven J. Sperra, Esq.
Oswald Center, 20th Floor
1100 Superior Avenue East
Cleveland, Ohio 44114
ssferra@littler.com

For the CWA:    David Passalacqua
14oo East Schaaf Road
Brooklyn Heights, Ohio 44131-1322
david4340@ameritech.net

## I.    BACKGROUND, FACTS AND STATEMENT OF JURISDICTION

Most, but not all, of the essential facts giving rise to this arbitration are not in dispute.

In a nutshell, Mr. Daniel J. Fortney, the Grievant in this case, was dismissed from employment with AT&T as a result of an accident while driving a company vehicle that resulted in the death of a 22-month old child, ▮▮▮▮▮▮▮▮, who was in a stroller when he was struck by a commercial vehicle (a bucket truck) operated by Mr. Fortney. Significantly, there was no evidence of distracted driving (either *via* text or phone or iPad), or drugs or alcohol playing any role in the accident that led to the death of the infant (UX 13 at 22). **While the Grievant was initially charged with one count of vehicular manslaughter, a misdemeanor**

1

**of the second degree in violation of O.R.C. 2903.06 (A)(4),** [1] **he eventually plead to a lesser, non-criminal traffic offense, and eventually served 60 days in jail.**  In the opinion of the Grievant's personal legal counsel, this means that in the opinion of the prosecutor for the City of Cleveland, the Grievant's act was not intentional or reckless, but simple negligence, the lowest form of legal culpability under the rules that govern criminal cases in Ohio. (UX 13 at 23).

It is of special importance in the resolution of this grievance that it was confirmed in discovery in both the civil and criminal cases that Mr. Fortney was not operating a phone or texting at the time of the accident, nor was he in any way chemically impaired (through alcohol or any other means) while driving.  Moreover, the Grievant was confirmed as traveling the speed limit, 35 mph, *via* both GPS and accident reconstruction.  The actual location of the accident, which is in dispute, was on an inherently dangerous intersection, given the absence of crosswalks and the traffic on the north bound section of the crosswalk (near a busy bus stop in Cleveland).

In the Union's view: "Simply put, while resulting in the tragic loss of life of a young boy, this was a traffic accident, in many ways the same as those that occur every day." (JX 13 at 24).  It should not result in the Grievant's discharge.

---

[1]     The Ohio Revised Code at issue in relevant part reads as follow:

> (A)  No person, while operating or participating in the operation of a motor vehicle, motorcycle, snowmobile, locomotive, watercraft, or aircraft shall cause the death of another or the unlawful termination of another's pregnancy in any of the following ways:
>
> *   *   *
>
> (4)  As the proximate result of committing a violation of any provisions of any section contained in Title XLV of the Revised Code that is a minor misdemeanor or of a municipal ordinance that, regardless of the penalty set by ordinance for the violation, is substantially equivalent to any provision of any section contained in Title XLV of the Revised Code that is a minor misdemeanor O.R.C. 2903.04 Lexis 2020.

Had there been any evidence that Mr. Forney was speeding at the time of the accident, he would have been charged under subsection (A)(3), which reads:

> (3) In one of the following ways:
> (a) Negligently;
> (b) As the proximate result of committing, while operating in the operation of a motor vehicle  *  *  * a speeding offense *  *  *

Similarly, if he was found to have been texting or talking on the phone, he could have been charged with a violation of subsection (A)(2) or (A)(3), which reads:

> (2) in one of the following ways:
> (a) Recklessly;
> (b) As the proximate result of committing, while operating or participating in the operation of a motor vehicle *  *  * a reckless operation offense *  *  *

Finally, had he been found to be under the influence, he would have been charged with a violation of subsection (A)(1) See, UX 13 at 23.

**Important to note that Mr. Fortney was never found, nor did he plead to, a *criminal offense* of any kind.  What is before me in this proceeding is a traffic accident, albeit tragic as it resulted in the death of a child.**

Noteworthy, at the time of the accident the civilian police officer at the scene did not charge Mr. Fortney with any violations, and after an extensive on-site investigation Mr. Fortney was released with no citations or actions. As a Senior NCO Mr. Fortney was aware of his obligation to self-report and did so within less than 30 days at his next unit drill assembly to his rating officer, the Company Commander, who immediately initiated a CCIR through his chain of command.

Notwithstanding the accidental nature of this matter, AT&T discharged the Grievant on November 25, 2019 (UX 1). The actual letter of suspension pending dismissal listed the reasons for the Company's actions as follows:

> The purpose of this letter is to notify you that you are suspended pending dismissal for violation of Code of Business Conduct, Tech Expectations, and Safety Preventable Motor Vehicle Accident on September 25, 2017. Your suspension pending termination is effective November 15, 2019.

A grievance was filed that same day, November 25, 2019 (UX 2). The Union requested reinstatement and make-whole relief for Mr. Fortney.

Unable to resolve the matter in the lower stages of the grievance procedure, the matter was moved to final and binding arbitration. An in-person hearing was held before the undersigned Arbitrator at Littler Mendelson, PC, 1100 Superior Avenue, 20th Floor, Cleveland, Ohio, on November 17, 2020. The parties appeared through their representatives and entered exhibits and testimony. Post-hearing *Briefs* were filed on January 11, 2021, and exchanged through the offices of the arbitrator. The record was closed on that date.

## II. ISSUE FOR RESOLUTION

The parties stipulated that the issue for resolution is whether the Grievant, Daniel Fortney, was discharged for just cause and, if not, what shall be the remedy.

## III. POSITION OF THE EMPLOYER

**The position of the Company, as outlined in its opening statement and post-hearing *Brief*, is summarized as follows:**

**The Company Had Just Cause to Terminate the Grievant's Employment Based on the Severity of his Motor Vehicle Accident (*Brief for the Employer* at 18-19).**

Initially, the Company maintains it had just cause to terminate the Grievant's employment based on the severity of the accident, which resulted in a fatality and serious injuries

3

to a second pedestrian (*Brief* at 18).  A wealth of arbitral law – including a decision by Arbitrator Daniel Brent in a case involving these same parties – plainly establish the arbitral principle that a serious motor vehicle accident justifies immediate termination of employment, particularly where, as here, it results in a fatality.  Although the Union attempts to obfuscate the Company's just cause basis for termination through specious claims of "disparate treatment," asserting the Grievant "did nothing wrong," and blaming the victims, the Union has presented no persuasive evidence or arguments to mitigate the penalty of discharge, in AT&T's view. The Grievant's inexcusable failure to explain the accident, coupled with the Union's claim at hearing that his criminal conviction was a "legal fiction," further demonstrate a fundamental lack of accountability that eviscerates any rational bases to reverse the Company's discharge decision (*Brief* at 18).

The Administration submits the Grievant's criminal negligence [2] resulted in one of the most severe accidents in the Company's Midwest history – and only the second known accident resulting in a pedestrian fatality in nearly two decades. The duty of trust owed by the Company to the public includes a core commitment that employees entrusted to operate Company vehicles in the public domain will do so in the safest manner possible to safeguard the public. Tragic as this accident was, by operating his bucket truck in such a grossly negligent manner as to cause the death of a 22-month old child and serious injuries to his mother, the Grievant violated the most basic of his job responsibilities and forfeited his right to continued employment. Because the Company had just cause to terminate the Grievant's employment under both policy and arbitral precedent, the grievance must be denied (*Brief* at 18-19).

**The Just Cause Standard**

Management points out that in another case involving an affiliated AT&T company, the undersigned Arbitrator, in 2010, articulated the following *just cause* standard:

> What is clear from reading arbitrators' decisions in the area of just cause is that any determination of just cause requires two separate considerations: (1) Whether the employee is guilty of misconduct, and (2) Assuming guilt, whether the discipline imposed is a reasonable penalty under the circumstances of the case. The universal rule in grievance arbitration is that the Employer must carry the burden of proof of just cause in a discipline or discharge case (*Unpublished Decision and Award, Illinois Bell Telephone Co. and IBEW Local 21* (Devencia Discharge)(Hill, 2010), attached as Exhibit A in Company's *Brief*).

---

[2]     Again, there was no finding of *criminal* or *gross negligence* in the judicial forum, nor did the Grievant ever plead to a criminal offense (more on this later).  Contrary to management's characterization (and conclusions), the Grievant's plea agreement was just that – a plea agreement designed to bring finality to the matter.  Discussed in this opinion, *infra* at 27-28, by all accounts it was indeed a "legal fiction," as articulated by Judge Sweeney, who presided over the case in the judicial forum. Giving the absence of two prior (2) convictions (required for the code the Grievant entered a plea), the Judge's characterization of "legal fiction" is arguably appropriate.

Other arbitrators have defined the just cause standard as meaning "the employer did not act arbitrarily, capriciously, discriminatorily, or make a decision not based on fact." *Atlantic Richfield Co.*, 69 LA (BNA) 484, 487 (Sisk, 1977). Whether or not the Union or the arbitrator would have acted differently is not at issue under a just cause standard, as long as the employer's action was not arbitrary or without basis in fact. *Pepsi-Cola Bottlers of Akron, Inc.*, 87 LA (BNA) 83, 88 (Morgan 1986). It is well settled that in cases of serious misconduct, the appropriate penalty and granting of leniency lies within the company's exclusive discretion. *Lenzing Fibers Corp.*, 105 LA (BNA) 423, 429 (1995). While the case is dated (1945), Arbitrator Whitley P. McCoy is often cited for the principle that in cases of employee misconduct meriting disciplinary action:

> [I]t is primarily the function of management to decide upon the proper penalty. If management acts in good faith upon a fair investigation and fixes a penalty not inconsistent with that imposed in other like cases, an arbitrator should not disturb it. The mere fact that management has imposed a somewhat different penalty or a somewhat more severe penalty that the arbitrator would have, if he had the decision to make originally, it is no justification for changing it. The minds of equally reasonable people men differ. * * * If an arbitrator could substitute his judgment and discretion for the judgment and discretion honestly exercised by management, then the functions of management would have been abdicated, and unions would take every case to arbitration. The result would be as intolerable to employees as to management. The only circumstances under which a penalty imposed by management can be rightfully set aside by an arbitrator are those where the discrimination, unfairness, or capricious and arbitrary action are proved -- in other words, where there has been abuse of discretion. *Stockham Pipe Fittings Co. & United Steelworkers of America (CIO)*, 1 LA (BNA) 160, 162 (March 28, 1945).

See, *Brief for the Employer* at 19-20.

AT& T submits an arbitrator should only set aside management's penalty "where discrimination, unfairness, or capricious and arbitrary actions are proved." *Kellogg Co.*, 28 LA (BNA) 303, 308 (1957). Under these standards, the Company has met its burden to prove its just cause basis to terminate the Grievant's employment (*Brief* at 20).

## A Serious Motor Vehicle Accident Resulting in a Fatality Constitutes Just Cause for Termination (*Brief* at 20)

Asserting that arbitral case law firmly establishes the principle that a serious motor vehicle accident may justify more severe discipline, including immediate termination, particularly for a fatal accident, management argues it had just cause to terminate the Grievant's employment. See, *AT&T Midwest and Communications Workers of America District 4 and CWA Local 4340* (Discharge of Thomas Bryan). Although that case did not involve a fatal

accident but a discharge for multiple minor accidents, Arbitrator Brent recognized the core legal principles that govern Mr. Fortney's case. Here, Arbitrator Brent explicitly recognized the duty of trust the Company owes to the public to effectuate its operations in a safe and lawful manner: "As a business entity whose employees drive hundreds of vehicles on public roads, the Company has a valid business interest in protecting its employees and the general public from injury or property damage caused by its employees." To maintain that duty of trust, Arbitrator Brent articulated the governing tenet: "Employers may also impose more severe discipline on employees who are involved in major preventable accidents, especially where the employee's gross negligence has been established as a factor in causing the accident." Consistent with this rationale, Arbitrator Brent further opined: "In addition, gross negligence resulting in a serious accident may justify immediate termination of employment."

This is not an abstract principle, argues management. Other arbitrators have likewise found just cause to terminate an employee for a severe MVA, especially an accident resulting in a death. See, Arbitrator Kravit's decision in *Jax Transit Management Corporation*, 126 LA (BNA) 955, 955 (Stanley Kravit 2009)(where the grievant's employment was terminated for operating a vehicle with gross negligence, bypassing its standard disciplinary steps for the same. In finding just cause for discharge, Arbitrator Kravit reasoned that the accident was thoroughly investigated and the grievant's culpability was fully demonstrated by the record evidence and investigative reports). See also, *Greyhound Line, Inc.*, 2001 BNA LA Supp. 109177 (Duff 2001)(grievant bus driver, hit and killed a pedestrian at an intersection; grievant convicted of reckless driving. Company terminated his employment pursuant to a zero tolerance preventable accident policy, despite the grievant's "outstanding work record and thirty years of service.").

Consistent with *Jax Transit Management* and *Greyhound*, many other arbitrators have upheld the discharge of employees involved in serious MVAs. See *Bi-State Development Agency*, 88-1 Arb. ¶ 8216, 9 (Cipolla 1988) (upholding discharge where grievant's bus was struck by a train because "the Grievant failed to exercise due diligence in performing his duties and that this failure constituted a serious driving deficiency on the part of the Grievant."); *Pierce Transit*, 1998 BNA LA Supp. 103243 (Prayzich 1998) (upholding discharge where grievant's gross negligence contributed to a serious MVA, as a "contrary ruling would be a disservice to all concerned and run a risk of repetition, jeopardizing safety, and posing a potential danger to the Grievant and the traveling public"); *Labor Arbitration [Redacted]*, 2015 BNA LA Supp. 175188 (2015) (upholding discharge where grievant negligently wrecked a school bus into another vehicle causing extensive damage and injuries because "the potential for serious injury and death was present due to the Grievant's high degree of negligence," and the seriousness of the offense "overshadow[ed] any mitigating factors"); *Energy Petroleum Company*, 2007 BNA LA Supp. 118730 (Fitzsimmons 2007) (upholding discharge where grievant's negligent operation of a tanker truck resulted in a serious MVA with significant property damage and injuries to pedestrians because the "[g]rievant had the responsibility to the Company and to the public to drive extra carefully considering he was operating an 80,000 pound" vehicle and failed to do so); *Buffington Harbor Riverboats*, 1998 WL 1073771 (Brunner 1998) ("If there is any doubt as to the appropriateness of the discipline/discharge of one entrusted with the lives and safety of a

6

public that must of necessity entrust itself to that person, then any doubts in a 'razor's edge' case must resolve in favor of management… Plainly, in no instance may public safety be subordinated."). Other labor arbitrators have recognized this principle. See generally Rabanco Recycling, 118 BNA LA 1411, 1417 (Gaba 2003) ("[G]ross negligence can constitute just cause for termination where the life and safety of fellow employees or the public is contingent on the care exercised by an employee."); Corn Products, 1993 BNA LA Supp. 105258 (Petersen 1993) ("an employer may take harsh disciplinary action, including discharge, when an employee's carelessness or negligence creates a risk of potential or actual injury or death"); Montgomery Division of QMG, Inc., 2000 WL 36175907, *5 (Bain 2000) (because "bus driving is an occupation that requires considerable skill and responsibility and that the possibility of an accident or danger to passengers or pedestrians is to be avoided" . . . a finding of reckless driving "does not require progressive discipline.").

The above wealth of precedent provides the clear legal framework governing this case, argues management.

## The Grievant Committed the Misconduct: A Serious MVA Resulting in a Fatality (*Brief* at 24).

While management asserts "there is no dispute the Grievant committed the misconduct at issue: He was solely responsible for the severe MVA that resulted in the death of ▮▮▮▮▮ and injuries to Ms. ▮▮▮▮▮." the Union is not on board with this conclusion. In support, management cites (1) the Police Report, (2) two eye-witness statements, and (3) video footage that shows the Grievant's vehicle veered off of the road and slammed into two pedestrians standing on the apron of the apartment complex's driveway, killing one on impact and severely injuring the other (*Brief* at 24).

Also in dispute is the Employer's declaration that "it is equally undisputed that the Grievant's conduct was criminally negligent." In the Company's words:

> The Grievant was criminally charged specifically because his vehicle veered off the road before it struck the woman and stroller. His guilty plea and 60-day jail sentence for operating his vehicle in "willful and wanton disregard" for the safety of the public was no "fiction," as the Union falsely claims. The Grievant was criminally charged and convicted because he recklessly drove his vehicle in a manner that caused him to strike and kill a 22-month-old child and cause injuries to his mother.

The Grievant's inexcusable failure to recount the events of the day manifests his gross negligence, management argues. At the AP interview, Dismissal Panel, and hearing, the Grievant inexplicably provided no explanation for the accident. The Grievant lacks recall precisely because he did not see the woman and stroller, even upon impact, which, by definition, means the Grievant was not watching the road and not driving in a safe and defensive manner (*Brief* at 24).

7

**The Penalty of Discharge is Reasonable and Appropriate (*Brief* at 25)**

AT&T maintains the discharge penalty for the Grievant's gross negligence is reasonable and appropriate under the circumstances. Similar to *Jax Transit Management* and *Greyhound*, the Grievant's preventable MVA caused the death of one pedestrian and grave injuries to another. And absent any explanation or justification for the Grievant's failure to control his bucket truck, the Company had no assurances he could correct his conduct in the future.

As Arbitrator Duff reasoned in *Greyhound*, the Company cannot reasonably be forced to retain a driver whose preventable accident caused a fatality and cannot reasonably assume the risk of having the Grievant driving a Company vehicle and causing a similar accident. The Company is entitled to treat safety as a paramount priority and to take responsibility for guaranteeing it to the public.

In addition, it is undisputed the Grievant's misconduct violated several Company policies, and the severity of the MVA warranted immediate discharge under the Manager's Guide and COBC. The Grievant plainly violated the TFS Technician Expectations and related EH&S Safety policies by failing to adhere to defensive driving principles, and with tragic results. The Technician Expectations provide "[e]mployees must follow all defensive driving expectations," as well as all "EH&S policies and guidelines." (CE 6). The Grievant completed his annual defensive driving course in November 2016, which not only covered this information, but included review of the Defensive Driving Job Aid that explained these guidelines and practices in detail. (CE 7). As Plant succinctly testified, "if [the Grievant] was engaged in defensive driving and looking forward as he was driving, he would have seen a [mother and her] child on the apron." (R. 133).

The Grievant also committed a "Preventable Accident," defined in the Manager's Guide as (1) "fail[ing] to follow a company policy, practice, procedure, and/or law in cases of motor vehicle accidents for which discipline is commonly imposed in the absence of an accident," or (2) "not tak[ing] clearly reasonable steps to avoid hazards when failure to take such steps would commonly result in discipline in the absence of an accident." (CE 5). The policy also notes the "violation of policy and/or the law is either willful disregard or a negligent act." (CE 5). Here, the Grievant pled guilty to operating a vehicle with wanton or willful disregard of persons or the public, thereby failing to adhere to Company policy and the law; and failed to take reasonable steps to avoid hazards, i.e., being unaware of his surroundings, despite a clear understanding of defensive driving obligations. The Grievant thus violated EH&S Safety standards by failing to follow Company policy and the law and to take reasonable steps to avoid hazards when operating his vehicle, as evidenced by a preventable MVA and fatality (R. 137; CE 4; CE 5).

Finally, the Grievant violated COBC provisions requiring "reasonable precautions to safeguard the public," and avoidance of "misconduct that could… negatively affect the

8

Company's reputation or business interests." (CE 8). As Plant explained, the Grievant violated the COBC because he engaged in unlawful misconduct and was charged with the operation of a vehicle in wanton or willful disregard, which also breached the Company's duty of trust to safeguard the public. (R. 137, 168; CE 5; CE 8). The evidence thus demonstrates the Grievant's fatal MVA violated the Company's duty to safeguard the public and its trust in him as an employee. The Grievant's preventable MVA resulting in a fatality was severe and solely attributable to his own gross negligence. Under the legal principle articulated by Arbitrator Brent and recognized by other arbitrators, and the authority accorded under the Manager's Guide and COBC, the Company properly exercised its discretion to escalate discipline to discharge due to the severity of the Grievant's offense.

Accordingly, and pursuant to the undisputed facts and arbitral precedent, the Company has met its burden to prove its just cause to terminate the Grievant's employment.

## The Union Failed to Prove Any Basis to Mitigate the Company's Just Cause for Termination (*Brief* at 27-29)

AT&T further asserts the Union's arguments fail to prove any basis to mitigate a just cause finding. The Union's specious claims of "disparate treatment;" that the Grievant "did nothing wrong;" and that the victims "could have been" standing on the street are factually and legally indefensible and do not mitigate the discharge penalty. The Union's sad claim that the criminal conviction was a "legal fiction" is a complete red-herring and self-serving rationalization to disclaim culpability.

The Union's Claim of Disparate Treatment Is Unfounded. The Union's core argument of "disparate treatment" because the grievant was terminated rather than issued the allegedly "standard" discipline of a written warning and 1-day suspension for a first MVA offense fails on the law and on the facts. The Union has a high burden to prove the affirmative defense of disparate treatment. See, *Stone Container Corp.*, 106 LA (BNA) 475 (Gentile 1996). As Arbitrator Deitsch has explained: The burden of proof that the Employer acted in a discriminatory or disparate fashion toward the Grievant rests with the party making the statement – the Union. The presumption that Employer's actions were proper will stand until Union establishes, by a "preponderance of the evidence," that it was not. To proceed in contrary fashion would unduly burden the Employer by encouraging all employees who are disciplined to charge discrimination/disparate treatment and challenge the company to prove it. *Fort Wayne Community Schools*, 78 LA (BNA) 928, 937 (1982). To prove disparate treatment, a union must prove two elements: (1) the grievant was treated differently; and (2) the circumstances surrounding the grievant's offense were substantively like those of individuals who received more moderate penalties. *Genie Co.*, 97 LA 542 (Dworkin 1991). Undisputed facts prove the Union has not satisfied either element (*Brief* at 28).

9

In support of its disparate treatment claim, the Union presented copies of written warnings and 1-day or 3-day suspensions issued to approximately nine (9) different employees for a preventable MVA. Significantly, the Union conceded that none of those disciplines were based on misconduct substantially similar to the Grievant's misconduct, to wit, none of the Union's evidence involved a preventable MVA that resulted in a fatality or even grave injuries to pedestrians. (R. 240-41). These factual differences defeat the false claim that other employees engaged in similar conduct as the Grievant but received lesser punishment.

The Union's corollary claim that the Company lacked authority to escalate discipline to termination for a first preventable MVA offense is equally unavailing. Arbitrator Brent squarely refuted that principle in the Bryan Discharge Arbitration decision. Accordingly, the Company's discretionary authority to elevate the Grievant's discipline to termination based on the accident's severity is beyond reasonable dispute.

The Company's termination in January 2019 of a Michigan technician involved in a fatal MVA provides the final proof to reject the Union's disparate treatment claim. Richard Plant testified without contradiction that Michigan technician Brent Beardsley was terminated on or about January 7, 2019, as a result of his MVA in a Company vehicle which resulted in the death of two persons in another car (R. 147-51; CE 10). Other than the Grievant and Beardsley cases, neither Richard Plant nor Terra Todd were aware of any other cases involving an MVA in a Company vehicle that resulted in a fatality within their long tenures. The Company's identical treatment of the Grievant and Beardsley eviscerates the Union's disparate treatment claim (*Brief* at 29).

**The Union's Other Arguments to Mitigate Are Unpersuasive.** The Union's speculation that the victims "could have been" standing on the street is baseless and irrelevant, and in any event does not exonerate the Grievant's misconduct. Moreover, Union witness Nick Roberts' testimony conclusively debunked this unfounded allegation. The objective evidence the Grievant veered off the road and hit Ms. ▮▮▮▮▮ and the stroller in the driveway – and not on the street – is uncontroverted. The Police Report's narrative and diagrams and the witness statements corroborated that location of the collision, and the Grievant provided no contrary evidence. Most damning, though, Union witness Nick Roberts confirmed through testimony and illustration (the X he marked on Union Exhibit 6A) the accident occurred on the "apron" portion of the driveway. (CE 1; R. 55, 140, 215-17; *Brief* at 29-30). Moreover, where the victims were standing is irrelevant to the Grievant's negligent operation of his vehicle. As Plant explained, whether "the child and mother were in the apron or the bottom of the apron or they were one foot into the street, [the Company's] expectation is you look where you are driving, you are aware of your surroundings, and you drive around or stop versus hitting somebody." (R. 139-40). The Grievant's negligent failure to control his truck was the direct cause of this serious accident and its consequences. The Union's effort to blame the victims does not exculpate the Grievant's grievous misconduct (*Brief* at 30).

10

**The Union's argument that the Grievant "did not do anything wrong" because he was not under the influence of drugs or alcohol, not speeding, and allegedly not distracted also strains credulity.** As Arbitrator Elliot H. Goldstein discussed in *United Parcel Service, Inc.*, 1996 LA Supp. 116538 (1996), "three elements play a role in any accident – the human element, the vehicles, and the condition on the road." In that case, as here, there was "no evidence that the latter two factors precipitated the accident. The day was bright, visibility was good, and the road surface was unhampered by any adverse weather conditions… [and] there were no structures or crops to obstruct a full view in all directions." Likewise, Arbitrator Goldstein noted there was "no indication that [] the Grievant's vehicle… failed to operate properly." That left "human error as the only plausible, probable explanation for the collision."

In this case, the Grievant did not pay attention to his surroundings. His vehicle left the road for reasons still unknown, and he only saw a "flash" of a person at the moment of collision. Because the Grievant presented no evidence of any factor that could explain, much less justify, his failure to control his vehicle and avoid the accident, his own negligence is the only plausible, probable explanation for the accident (*Brief* at 30).

**Finally, management asserts the Union's argument the Grievant's guilty plea was a "legal fiction" and "nothing more than a parking ticket" is a baseless, after-the-fact rationalization that reveals his lack of accountability for his own wrongdoing (*Brief* at 30).** The Union concocted this argument after the Dismissal Panel and after the Grievant was terminated. When carefully reviewed, the Union's "evidence" on this point actually proves the serious nature of the Grievant's misconduct. The evidence reveals that, based on the severity of the accident, the Grievant received a "Memorandum of Reprimand" from his Commanding Officer for the Ohio National Guard, Brigadier General Rhodes. The Reprimand was to be placed in the Grievant's permanent file and would have resulted in a demotion in rank and a possible order preventing him from re-enlisting. In response, the Grievant's criminal lawyer, Jay Crook, wrote a letter to Rhodes, pleading for reconsideration and leniency. That letter spawned the "legal fiction" theory. Judge Sweeney's later letter to Rhodes also pleaded for leniency in the Grievant's military case. Importantly, that letter reveals two critical facts: (1) that "the prosecutor and the victim's family requested specific punishment," and (2) "The plea and sentence were agreed to by the parties." The Grievant's criminal conviction and jail sentence were not fictions. This unfortunate argument does not erase the undisputed fact that the Grievant operated a 16,000 pound vehicle with willful or wanton disregard for the safety of the public and with tragic consequences. This was no parking ticket, and this shameful Union argument removes any basis to mitigate (*Brief* at 30-31).

**CONCLUSION.** For all the above reasons, the Company asserts it had just cause to terminate the Grievant's employment, based on his gross negligence in causing a severe MVA that resulted in the death of a 22-month old boy and serious injuries to his mother. Accordingly, the instant grievance should be denied in its entirety (*Brief* at 31).

## IV. POSITION OF THE UNION

Asserting there was not just cause to terminate the Grievant's employment, the Union makes the following points in support of its position:

**The Grievant's military discipline, its favorable resolution and the reason it is being offered as mitigating character evidence favors the Grievant's case for reinstatement and make-whole relief (*Brief for the Union* at 5).** The evidence record indicates that at the accident scene the Grievant acted with dispatch, performing under extreme stress and in complete compliance with company policies and practices. According to the Union: "The company never considered Dan's response to this situation in its entirety, i.e., his affirmative reaction to the situation under extreme pressure. Their disciplinary response was a knee-jerk belief that Dan was somehow negligent or used poor judgment. * * * [I]t is clear that the company fired Dan Fortney because it was the same corporate decision on their part." (*Brief* at 5).

At all times the Company's theory was that Mr. Fortney was guilty of negligence, and that the Grievant's negligence resulted in the death of a child, according to the Union (*Brief* at 6). It was a severe enough infraction that it required the company to terminate the Grievant's employment. In response, the Union argues that management has no evidence of negligence by the Grievant.

**While recognizing the injury that occurred, including the death of a child, the Union points out that in the end the matter was reduced to a violation of the Ohio Traffic Code.**

The Union insists that the Grievant's military record is relevant for two reasons: (1) it shows that the Grievant is an extremely stony-minded individual who can and will overcome adversity, and (2) it shows that Mr. Fortney is a person of high character and moral responsibility (*Brief* at 8-9). To this end the Union maintains the declarations of Judge Sweeney regarding the Grievant military appeal are relevant to determining Fortney's fate (*Brief* at 9). According to the Union: "Judge Sweeney's letter and those of his military comrades are in strict contradiction of the opinions of the company witnesses. They repeatedly raised the issue of Fortney's fitness for duty by their continued attacks of his alleged negligence and judgment without providing any proof or evidence." (*Brief* at 9).

**The Company did not establish just cause nor meet its burden of proof since it failed to conduct a fair and impartial investigation of the facts surrounding the accident (*Brief* at 11).** Here, the Company cites the seven (7) tests outlined in another lifetime by Arbitrator Carroll Daugherty in *Enterprise Wire Co., Blue Island, Illinois & Enterprise Independent Union*, 46 LA (BNA) 359 (March 28, 1966). In summary form they are:

- **Reasonable Rule or Work Order. Is the rule or order reasonably related to the orderly, efficient, and safe operation of the business?**

12

- **Notice.** Did the Company give to the employee forewarning or foreknowledge of the possible disciplinary consequences of the employee's conduct?
- **Sufficient Investigation.** Was an investigation conducted before making a decision?
- **Fair and Objective Investigation.** Was the investigation conducted fairly and objectively?
- **Proof.** At the investigation did the judge obtain substantial evidence or proof that the employee was guilty as charged?
- **Equal Treatment.** Has the Company applied its rules, orders, and penalties evenhandedly and without discrimination to all employees?
- **Appropriate Discipline.** Was the discipline administered by the Company in a particular case reasonably related to (a) the seriousness of the employee's proven offense, and (b) the record of the employee in his service to the Company?

A "no" answer usually implies that the just cause standard was not been met (**Brief at 11**).

In the Union's eyes, what the company did in investigating the matter fell far short of what is required in the Daugherty tests. In the Union's words:

> The investigation was not fair because the Company refused to investigate any theory as to what happened other than reading the police report. The Union on the other hand did an investigation of the crash site. Director Nick Roberts took pictures and measurements in an attempt to understand the accident. Under exhibits 1A-7 show the obstructions in the tree lawn all the way down the slope. Included in that sequence is the van that monetarily disappears behind all the interference coming down the curved slope. Picture number 5 shows the long boulder at the base of the apron that was not struck during the accident. Picture number 8 shows the 30 foot driveway apron with the two large boulders that were not hit or moved. Contrary to company testimony, the only skid marks were founds on the opposite side of the street. (Brief at 13)

> \*   \*   \*

> The Union does not believe that it is reasonable or foreseeable to assume that an approximately 16,000 pound bucket truck could drive into and then out of a 50-foot driveway apron without hitting either of the boulders. They also believe that it is possible that neither Dan nor Ms. ▮▮▮▮▮▮ may have seen and each other and it resulted in this terrible tragedy. This opinion is based on pictures and measurements taken right after the accident.

A standard of proof of clear and convincing evidence is warranted in this case (*Brief at 18-19*).

**Arbitral precedent favors the Union's position (*Brief* at 16).** The Union cites *Amalgamated Transit Union, Local 1395 & Escambia County Area Transit*, 2006 LA Lexis 228 (Terrill, 2006), and *IBT Local Union 278 & Seven-Up Bottling Company of SFO*, 2004 Lab. Arb. Lexis 709 (Riker, 2004), as supporting Mr. Fortney's grievance. In both cases the Arbitrator rejected an employer's reliance on third-party reports, such as a police report or an insurance company investigation.

The Union insists that AT&T never conducted any meaningful independent investigation of the accident and, instead, relied on a third-party investigation, the Cleveland Police Report, in making its decision to discharge Mr. Fortney (*Brief* at 18).

**Conclusion – the Company failed in every respect to conduct a meaningful independent investigation in order to establish proof in discharging the Grievant (Brief at 19).** The Company simply relied on the police report, a grainy video (that was never entered into evidence) and their subtle accusations that the Grievant was not cooperating in the investigation. Also management took no interest in considering whether obstructions could have been a factor in the accident. Management also ignored Ms. ███████ possible role and the entire argument presented by the Union as to the possibility of turning into, ten out of the 50-foot driveway entrance without causing damage. Management discounted this argument because the police report provided otherwise, in the Union's view (*Brief* at 19). The Union points out that the legal case against Fortney was complicated, with the news media covering it from start to finish. The jurisdiction was difficult because the city kept changing prosecutors and dragged the case until the civil suit settled. After a long process and negotiation, Fortney elected to take the plea offer. He did what agreed to do without comment and complaint. He was accountable, which works in his favor. A guilty plea entered by the Grievant is insufficient to deny this grievance (*Brief* at 10).

**The remedy for the improper discharge** is reinstatement to his former position at AT&T and be made whole in every way, including, but not limited to, back pay (including his long suspension prior to his discharge), seniority, vacation, holidays and other paid time off as well as his entire benefit package (*Brief* at 19).

## V.   DISCUSSION

### A.   IT IS THE EMPLOYER THAT BEARS THE BURDEN TO JUSTIFY THE DISMISSAL OF THE GRIEVANT

The National Academy of Arbitrators (NAA), in their recent text, *The Common Law of the Workplace* 177 (BNA Books, 2005)(second edition), considered the issue of just cause and had this to say on the issue:

§6.5.   Reasons Constituting Just Cause

(1) The essence of the just cause principle is the requirement that an employer must have some demonstrable reason for imposing discipline.  The reason must concern the employee's ability, work performance, or conduct, or the employer's legitimate business needs.

(2) *Ability and performance*.  An employer may discipline an employee for failure to meet reasonable work standards.

(3) *Conduct*.  An employer may discipline an employee for violations of stated or generally known and reasonable work rules and expectations.

(4) *Business necessity*.  A termination for business reasons other than the employee's ability, work performance, or conduct is normally not regarded as discipline.  A layoff for lack of work, for instance, is not disciplinary.  In rare cases, however, a termination that is in fact within the classification of disciplinary and that would not otherwise be permissible may be justified for business reasons.

(5) Just cause is not synonymous with "fault."  An employee may violate work rules and merit discipline even if the employer cannot prove the employee actually intended the violation.

There is no significant differences between the terms "just cause," "proper cause," or "justifiable cause."  As stated by one arbitrator, and as reported by Hill & Sinicropi, "they all exclude discharge of termination from employment for arbitrary or capricious reasons, or mere whim. [3] One arbitrator observed that "the contractual requirement of establishing just cause necessitates a thorough and even handed inquiry into all of the events and circumstances [of the incident giving rise to the discipline].  *   *   * [A] fundamental aspect for establishing just cause is the necessity of conducting a fair, objective and thorough investigation before discipline is issued." [4]  Additionally, the Employer may be compelled to disclose to the Union relevant

---

[3]      *State of Iowa, Department of Corrections & AFSCME Council 61, PERB No. 11-GA-016* (Loeschen, 2011) (unpublished) at 11, citing Elkouri & Elkouri, *How Arbitration Works* (BNA Books)(6th Edition) at 932.

[4]      *City of Chicago & IAFF Local No. 2*, AAA Case 51 390 0601 84B (McAllister, 1985) at 13.  Significantly, Arbitrator Robert McAllister found that just cause included a requirement that the Administration make an independent investigation into the reliability of witnesses rather than take their statements at "face value." *Id.* at 13.  In the Arbitrator's words: "the failure to conduct background checks of the witnesses with respect to character, relationships, and reliability is not understandable. Compounding these oversights is the failure to probe and question the witnesses individually." *Id.* at 13-14.  Holding that the Employer must conduct a objective and thorough investigation is not uncommon, and failure to do so may result in the reversal of discipline.  However, in *City of Urbana, IL & IAFF Local 1147*, FMCS No. 140324-01687-A (Torosian, 2014), Arbitrator

documents and information relating to the treatment of similarly-situated employees, even absent a contractual discovery provision. [5]

Another Arbitrator summarized the just cause principle this way, focusing on many of the elements cited above:

"Just cause" consists of a number of substantive and procedural elements, but its essence may be summarized as follows:  Primary among its substantive elements is the existence of sufficient proof that the Grievant engaged in the conduct for which they were disciplined.  The second area of proof concerns the issue of whether the penalty assessed by the Employer should be upheld, mitigated, or otherwise modified.  Factors relevant to this issue include a requirement that an employee knows or is reasonably expected to know ahead of time that engaging in a particular type of behavior will likely result in discipline, the existence of a reasonable relationship between the employee's misconduct and the punishment imposed, and a requirement that discipline be administered even-handedly, that is, that similarly situated employees be treated similarly and disparate treatment be avoided. [6]

Arbitrator Stanley Sergent, in *MESA Airlines & ALPA*, Grievance MAG-0019-10 DS (2011)(unpublished), elaborated on the concept of just cause, citing procedural requirements as follows:

In addition to the standards set forth above, the concept of just cause encompasses a number of procedural requirements.  For example, it requires that an attempt has been made to thoroughly and fairly investigate the facts and circumstances surrounding the event which led to the disciplinary action.  It includes an opportunity for the grievant and/or his representative to confront and critique the evidence relied upon by the Employer.  It also requires the Employer to consider the sufficiency of its evidence in light of the grievant's arguments and any exculpatory evidence he may present.  Finally, just cause requires the imposition of a penalty that that is proportionate to the seriousness of the violation and that the penalties be assessed for like offenses. *Id.* at 21-22.

---

Herman Torosian commented that the need for a formal investigation would be minimal when the grievant does not dispute what occurred. *Id.* at 27.

[5]     *Id.* at 15. According to the Arbitrator: "In the case of off-duty conduct, the City's consistent and equitable enforcement of the applicable Rules and Regulations, as incorporated by Article XVII, is information that is relevant and essential for the Union to adequately prepare and present its defense. Ultimately the subpoena authority of an arbitrator is enforceable through applicable courts." *Id.* at 15. Addressing policy reasons for this view, the Arbitrator elaborated: "the inability of either party to cooperate in the gathering of pertinent and relevant information slows the process and results in additional and unnecessary costs." *Id.* at 15-16.

[6]     *Portland Police Commanding Officers Association & City of Portland, OR* (Vivenzio 2014)(holding that the employer had just cause to suspend the grievant for 60 days, but not to effect a demotion, for a road rage incident where grievant displayed his badge and a holstered gun.  The grievant was adjudicated not guilty of a misdemeanor charge of exhibiting a deadly weapon in a criminal proceeding.  Correctly, the Arbitrator declared: "It is generally understood that an arbitrator is not bound by an acquittal in such a case, as the forums of civil criminal law and labor arbitration differ in many respects, including the burden of proof they apply and the values and interests they serve." *Id.* at 30.).

Arbitrator David Wilson, in *Grief, Inc. & United Steelworkers, Local 13029*, FMCS Case No 17/00232-6, 137 BNA LA 1229, 1235 (2016) outlined the requirements of just cause this way:

> For just cause to exist there must be:
>
> A work rule, job expectation or management directive reasonably related to the efficient, orderly and safe operation of the business.
>
> The rule, expectation or directive must be clearly communicated to the employees.
>
> Prior to administrating discipline the employer must conduct a full and fail investigation to determine if the employee violated the rule of job expectation.
>
> As part of the investigation the employee must be afforded the opportunity to present their side of the story.
>
> There must be consistent enforcement of the rules and job expectations for all employees, and
>
> The degree of discipline must be reasonably related to the seriousness of the employee's rule violation giving consideration to the employee's past work record.

Accord: *Anchor Hocking, LLC*, 137 BNA LA 1451 (Christopher Miles, 2017)(finding just cause lacking where company failed to obtain grievant's side of the story before effecting termination; Arbitrator declares: "due process requires that she [the grievant] be entitled to provide her side of the story or explain her actions before the discharge can be effectively finalized." *Id.* at 1458.); *In the Matter of Arbitration Between Town of ___ And Police Superior Officers Union, MCOP Local ___ [number redacted]* 2019 BNA LA Supp. 4664734 (Sharon Ellis, 2018)("If a rule is not enforced, employees cannot be disciplined for not following it. Employers must clearly notify their employees of their expectations and potential repercussions for the failure to meet them, * * * As such an employer cannot unexpectedly begin imposing discipline for previously lax rule violations without providing its employees with clear notice." *Id.*, citing *Discipline and Discharge in Arbitration* (BNA, 2nd edition) at 97-98).

Discussing progressive discipline, the National Academy of Arbitrators (NAA) outlined the generally-accepted principles as follows:

§ 6.7 Magnitude of Discipline; Progressive Discipline

(1) A given "cause" may justify some types of discipline but not others. The employer's chosen level of discipline must be "just."

(2) *Proportionality*. The level of discipline permitted by the just cause principle will depend on many factors, including the nature and consequence of the employee's offense, the

clarity or absence of rules, the length and quality of the employee's work record, and the practice of the parties in similar cases. Discipline must bear some reasonable relation to the seriousness or the frequency of the offense.

(3) *The progressive discipline principle.*

(A) Unless otherwise agreed, discipline for all but the most serious offenses must be imposed in gradually increasing levels. The primary object of discipline is to correct rather than to punish. Thus, for most offenses, employers should use one or more warnings before suspensions, and suspensions before discharge.

(B) *"Capital offenses."* Some offenses are sufficiently serious to justify serious discipline for a first offense. These include theft, physical attacks, willful and serious safety breaches, gross insubordination, and significant violations of law on the employer's time or premises. Some collective bargaining agreement list the offenses punishable by immediate discharge. If the agreement is silent on the point, the arbitrator must identify dischargeable offenses by using common sense, past practice, and company, industry, and social standards. [7]

With respect to the issue when progressive discipline is appropriate, Arbitrator Thomas Gallagher stated the principal this way:

> Some conduct may create such a threat to the enterprise that discharge should be immediate and it need not be preceded by an attempt to change the conduct, . . . Such serious misconduct may be so adverse to an employer that the employer should not be required to risk its repetition. For example, an employer should not be required to use training and corrective lesser discipline in an effort to eliminate the chance of repetition for most thefts, for drug use in circumstances that threaten the safety of others or for insubordination so extreme that it undermines the employer's ability to manage its operations. [8]

What is clear from reading arbitrators' decisions in the area of just cause is that any determination of just cause requires two separate considerations: (1) whether the employee is guilty of misconduct, and (2) assuming guilt, whether the discipline imposed is a reasonable penalty under the circumstances of the case. [9] The universal rule in grievance arbitration is that the Employer must carry the burden of proof of just cause in a discipline or discharge case.

---

[7]     *Id.* at 184-185. See, *County of Cook/Sheriff of Cook County & SEIU Local 73,* GRV 09-541 (Benn, 2011)("Discipline is meant to be corrective in that it is designed to send a rehabilitative and corrective message to employees who engage in misconduct that they must conform their conduct to the employer's rules and reasonable expectations of the workplace." *Id.* at 7, citing *Hyatt Hotels Palp Alto,* 85 LA (BNA) 11, 15 (Oestreich, 1985)).

[8]     *County of Dickinson & AFSCME Council 61* (Thomas Gallagher, 2007)(unpublished) at 15. Accord: *City of Minneapolis & Police Officers' Federation of Minneapolis* (Jay Fogelberg 2014)("Where the actions of an employee are so egregious and destructive to a continuing employment relationship – such as theft, willful injury to a fellow worker or property – there is no need to apply the normal or intervening steps." *Id.* at 15-16).

[9]     See also, *R.R. Donnelly Printing,* 114 LA (BNA) 5, 7 (Bognanno, 1999)("The instant case presents a well-settled two-step analysis: first, whether the Grievant engaged in the alleged misconduct; and second, whether the discipline imposed is appropriate under the relevant circumstances."); *Employer [redacted] & CWA,* 2018 BNA LA Supp. 4642857 (Stein,

B.     **ANALYSIS AND CONCLUSION**

Cases involving fatalities caused by employees or severe conduct arguably disqualifying to continued employment, both on- and off-duty, are not scarce in the reporting services.  A fair reading of the cases indicate arbitrators consider a number of factors (usually five) in assessing whether discharge is appropriate in accident cases including (1) the degree of employee culpability (is the employee merely negligent as opposed to acting in a wanton and reckless manner?  If drugs or alcohol are involved in the culpability matrix, the employee has an exacting burden to overcome);   (2) the outcome of the employee's conduct (what is the extent of any damages attributed to the employee?  Are fatalities involved or is properly damage the only outcome?);  (3) the employee's past work and disciplinary record (is this a first-time event or a repeat offense?  Has the employee received discipline for past misconduct?); and (4) the seniority of the employee (long-term employees are, with exceptions, treated more lenient than younger employees even if the offense is similar).  A fifth consideration (5) is how other employees have been treated for similar conduct, bringing into issue disparate treatment allegations.  To the extent that a union alleges disparate treatment, the burden is on the union to plead and prove that similarly-situated employees have been treated differently and that the grievant has somehow been signed out based on an impermissible criterion (more on this later).   Some arbitrators will consider whether retention of the employee will prejudice the employer's business in the future.  Sometimes arbitrators will consider the effect of the employee's conduct on the reputation of the employer (generally a consideration in the public sector). Important is this: No one factor is dispositive of the outcome, although there are employees that (for want of a better term) are DOA (disqualified on arrival) with little hope of succeeding in arbitration based simply on one of the above factors (serious misconduct, theft or physical assault, fueled by drugs or alcohol are generally disqualifying for continued employment).  See, e.g., *Akron Beacon Journal Publishing Co. & Newspaper Delivery Drivers, Local 473, IBT*, 85 LA (BNA) 314 (Lawrence Oberdank, 1985)(grievant crossed center line in vehicle resulting in conviction of vehicular homicide in Massillion, Ohio Municipal Court; arbitrator reduces termination to suspension without pay, reasoning that other employees who were involved in accidents while performing company duties were spared termination. Arbitrator rejects argument that other employees have never been involved in a fatal accident or had their driving privileges revoked as a result of a criminal conviction); *Mercy General Health Partners & Service Employees Local 79*, 123 LA (BNA) 1313 (Patrick McDonald, 2007)(while not directly on point, Arbitrator holds felony conviction insufficient to establish just cause for employee dismissal; Arbitrator reasons that longevity should be considered in determining just cause, but seniority should not make employee immune from charges or discipline.  Termination reduced to unpaid suspension); *Stafford-Lowdon Co. & IBT*

2018)("'Just cause' imposes on management the burden of establishing: (a) that the standard of conduct being imposed is reasonable and is a generally-accepted employment standard which has been properly communicated to the employee; (b) that the evidence proves that the employee engaged in the misconduct which did constitute a violation of that standard; and (c) that the discipline assessed is appropriate for the offense after considering any mitigating or extenuating circumstances.").

19

*Local 47*, 21 LA (BNA) 771 (Larson, 1953)(holding no just cause where employee's conviction was overturned ; Arbitrator notes that there was no evidence that employee was unruly or of a turbulent temper in his relations with other employees.  Also, no evidence that retention of employee grievant will prejudice company in its relation with employees or the public); *Tecumseh Products Co. & IBEW Local 2360*, 107 LA (BNA) 371 (Frank Keenan, 1996)(Arbitrator concludes that certain acts warrant discharge for a first occurrence, including fighting;  Arbitrator also notes that certain mitigating factors, such as long and unmarred service, are absent in this case.  Moreover, aggravating facts (long prolonged time in which fight took place with severe injuries) warrant termination); ***King Soopers, Inc. & United Food and Commercial Workers, Local No. 7*, Case No. 02-0348FMCS No. 020410-09549-7, 2003 BNA LA Supp. 110272 (John DiFalco, 2003)(observing that "negligence will get you disciplined, but not fired, but proven intentional acts will always result in termination")**; *American Airlines & TWU Local 507* , Case F-2481-02 (unpublished) (Hill, 2004)(sustaining dismissal of employee who left work early, consumed alcohol, drove, and subsequently causing death of motorist); *West Monona Community School District,* 93 LA 414 (Hill, 1989)(sustaining termination of high-school guidance counselor and coach who, while intoxicated and under influence of drugs, caused death of passenger; Arbitrator finds nexus between employee's off-duty conduct resulting in vehicular homicide conviction and job requirements); *Westlake City School District*, 94 LA (BNA) 373 (1990, Graham)(upholding discharge of school secretary to vice principal convicted of felony for improperly receiving Cadillac from dealership, finding adverse effect on school district); *City of Joliet, IL & AFSCME Local 440*, 108 LA (BNA) 7 (Cox, 1996)(reversing discharge of employee found guilty of two felonies, arson and conspiracy, reasoning no nexus existed between grievant's job, treatment plant laboratory technician and criminal activity; Arbitrator cited grievant's long seniority and absence of any discipline, and fact that employee's activities were not associated with his work); *Sprint/Central Telephone Co. of Texas*, 117 LA (BNA) 1321 (Baroni, 2002)(case did not involve criminal activity, but of interest Arbitrator says this regarding seniority: "While it is true that seniority is a factor to consider in assessing discipline, seniority alone cannot excuse repeated poor performance or job neglect."); *Chicago Transit Authority & ATY Local 308*, 121 LA (BNA) 1399 (Aaron Wolff, 2005)(sustaining discharge for employee's off-duty misconduct that result in plea agreement related to extortion – fraudulently obtaining drivers' licenses, including CDL's for persons not qualified to drive trucks; significantly, Arbitrator finds nexus between job and employee's conduct; Arbitrator notes that one improperly issued license resulted in the fiery deaths of a family traveling with children); *Nugent Sand Co. & IBT Local 527*, 71 LA (BNA) 585 (Kanner, 1978)(reversing discharge for off-duty conviction, holding negative inference when employer only relies on conviction in criminal forum, reasoning that "employer's investigation was superficially limited"); *Stafford-Lowdon Co. & IBT Local 47*, 21 LA (BNA) 771 (Larson, 1953)(holding employer had right to discharge employee who was convicted of shooting wife; however, when conviction was overturned (because of improper juror), employee had right to reinstatement; Arbitrator notes company is not obligated to grant employee leave of absence in the event he is convicted of crime and subsequently imprisoned); *Mercy General Health Partners & Service Employees Union, Local 79*, 123 LA (BNA) 1313 (McDonald, 2007)(reversing discharge and converting to unpaid suspension of orderly assigned to surgery

20

department for off-duty felony not reported to employer hospital; Arbitrator rejects zero tolerance rule as inconsistent with just cause, reasoning that "the level of discipline must have an appropriate relationship to the offense charged." *Id.* at 1316. Reflecting the better weight of authority, Arbitrator holds that "longevity should be considered in determining just cause." *Id.* at 1317.); *Southwest Airlines, Dallas, Texas & IBT Local 19*, 114 LA (BNA) 1797 (Jennings, 2000)(upholding dismissal of aircraft cleaner for making threats of "going postal" on coworkers); ***Akron Beacon Journal Publishing Company*, 85 LA (BNA) 314 (Lawrence Oberdank, 1985)(reversing discharge of rural driver who entered *nolo* plea to vehicular homicide, rejecting argument that progressive discipline should not apply because employee committed serious offense);** *Metropolitan Transit Authority & Transport Workers Union, Local 260*, 75 LA (BNA) 570 (Marcus, 1980)(upholding termination of transit operator who killed an individual attacking him, where employer's rules prohibited drivers from having weapons while at work, even though employee's apprehension of danger was reasonable and grand jury refused to return a "true bill" and all charges against the employee were dismissed; while the overall decision is suspect, Arbitrator correctly observed that "what constitutes proper cause for discharge cannot be stated categorically, and that the arbitrator must not only determine whether the employee was guilty of the act charged, but also whether such guilt constitutes industrial misconduct." *Id.* at 573); *JNESCO District Council, IUOE & Employer [number redacted]*, 2018 BNA LA Supp. 4651545 (Mattye Gandel, 2017)(union articulated position: "arbitrators, in applying the just cause standard, distinguish between error in judgment and 'gross negligence,' defined as intentional or willful acts of omission in flagrant or reckless disregard of the consequences to persons." Applying gross negligence standard, Arbitrator finds employee guilty of gross patient neglect, that without progressive discipline, constituted grounds for immediate termination); *Walt Disney World & Actors' Equity*, 127 LA (BNA) 353 (Roger Abrams, 2010)(reversing discharge of employee accused of making threats, reasoning that "companies, unions and arbitrators know that anything can happen in the workplace. A good employee can turn bad – and some do – but that does not justify firing a good employee based on mere suspicion under a zero tolerance rule." Citing *City of Indianapolis*, 118 LA (BNA) 357 (Kohn, 2003), Arbitrator endorses principle that mere suspicion is insufficient to justify discharge; Arbitrator effectively requires showing that employee has *actual intent of carrying out threat of violence)*; *United Can Company & IBT Local 748*, 1994 BNA LA Supp. 115367 (Ronald Hoh, 1994)(recognizing that courts are increasingly willing to impose liability upon employers for negligent hiring and negligent retention of employees known to have violent propensities); *In the Matter of Arbitration Between Union ___ and Employer ___ (Ohio)*, 2018 BNA LA Supp. 4654834 (Daniel Zeiser, 2018)(reversing discharge of patrol officer accused of violating deadly force policy where grievant dispatched to break in at grocery store and individual suspect killed; grievant indicted and acquitted for criminal negligence. Significantly, Arbitrator holds that just cause usually requires progressive discipline, "which gives the employee the opportunity to correct behavior and provides notice that failure to do so will lead to more severe discipline." [Tab #17]; *King Soopers, Inc. & United Food and Commercial Workers, Local 7*, 2003 BNA LA Supp. 110272 (John DiFalso, 2003)(noting that negligence will get an employee disciplined, not fired, as opposed to reckless disregard of employer's policies); *Downey Printing/Waukee, Inc.*, 1996 BNA LA Supp. 103433 (Charles Clark,

1995)(distinguishing between gross and simple negligence); *Tampa Electric Co. & IBEW Local 108*, 73 LA (BNA) 98 (J. Thomas Rimer, Jr., 1979)(applying willful negligence standard to employee's accident); *Veolia Transportation & ATU Local 1637*, 131 LA (BNA) 1345 (Matthew Goldberg, 2013)(classifying accidents into preventable and non-preventable, applying negligence standard to latter category); *City of Yorkville, Illinois*, 134 LA (BNA) 1665 (Matthew Finkin, 2015)(recognizing that employee's length of service and disciplinary record are, in part, determinative in a just cause case); *City of Peoria, IL & PBPA* (Elliott Goldstein, 1992)(finding preventable accident by police officer, Arbitrator upholds one-day suspension; Grievant held to have acted in reckless disregard for the safety of others (speeding through a red light in unmarked car in response to non-emergency event); *In The Matter of Arbitration Between Employer ___ & School Cafeteria Employees Local No. ___ ,* 2017 BNA LA Supp. 20000805 (Jared Kasher, 2017)(upholding unpaid suspension pending outcome of criminal proceeding, even though employer conducted no investigation of its own).

## C.    The Grievant's Story

Important in the resolution of this case is the Grievant's account of the tragic events that gave rise to his dismissal.

Daniel J. Fortney testified he started working for AT&T in August of 2,000 (R. 245). He indicated his father worked for the Company and also stated he started his military career before working at AT&T (R. 245). He stated he has no instances of discipline while working (R. 148).

Asked about the charge in the legal forum, Fortney answered "4511.20 M33, operation in willful – in willful or wanton disregard of the safety of persons or property with two or more priors." (R. 248). Significant here is Mr. Fortney testified under oath that he does not have two priors (R. 248). Fortney stated "I was told the legal fiction – that the legal fiction was going from the original charge to the amended charge." (R. 249).

Mr. Fortney went on to document his lawyer's letter (Jay Crook) to the general (military) with respect to the general order of reprimand that was pending (R. 249). Reading page 27 from the letter, Mr. Fortney stated:

> The final resolution came about as a result of a legal fiction. The prosecuting attorney required that Master Sergeant Fortney plead to the equivalent of a misdemeanor of the third degree. The reckless operation with a stipulation to two prior violations was the agreed-upon charge after months of negotiations. To be perfectly clear, Master Sergeant Fortney did not have any previous convictions for reckless operation of a motor vehicle. The charge was arrived at to allow Master Sergeant Fortney to put an end to two years of uncertainty and allow him to plead to a charge that did not include any allegation of the criminal taking of another's life while at the same time meeting the prosecuting attorney's requirement that Master Sergeant Fortney plead to a misdemeanor of the third degree. The fact that the prosecuting attorney did not demand Master Sergeant Fortney plead to a criminal act, the reckless operation charge is a violation of the traffic code, nor

to admit any culpability for the death of the young boy who lost his life is a clear showing of the lack of confidence in the ability to convict Master Sergeant Fortney. As I have previously noted, there were numerous evidentiary issues that would have been raised at trial that would bring allegation – that would bring any allegation of negligence of behalf of Master Sergeant Fortney into serious question (R. 250-251).

Of special note, and favoring the Grievant's case, Mr. Fortney documented a May 2020 letter generated by Judge Sweeney to Brigadier General Rhoades, the judge that was overseeing his case (*Brief* at 252). Of note is the following:

This discovery process, and the settlement of a civil case, led to a resolution that all parties accepted as fair. **Per the evidence provided through the extensive discovery, and the accident investigator's expert report, there was nothing to indicate there was any behavior on Mr. Fortney's part as driver other than accidental.** However, it is questionable whether there was any breach of duty, as no alcohol, drugs, speed, cell phone, or tablet were at issue, per my understanding of the evidence discovered. **The plea agreement took this case out of the Ohio Revised Criminal section, and amended it to an Ohio Revised Code Traffic Offense.** (R. 252-253; emphasis in bold mine).

Special note is this:

The plea and sentence were agreed to by the parties and the plea appears to be a legal fiction, as viewed from Mr. Fortney's driving record with the Ohip Bureau of Motor Vehicles.

●    *   *   *

**This honorable court does not understand how Mr. Fortney demonstrated a serious lapse of judgment or discredited himself. (R. 253; emphasis in bold mine).**


Mr. Fortney maintained he is fit to drive having completed a driving course mandated by the court (R. 254).

Letters were introduced indicating the work record of the Grievant (R. 256).

Asked about the military, Mr. Fortney testified that initially he was demoted in grade as a result of the accident (R. 257). Mr. Fortney acknowledged that he could have faced severe disciplinary action from the military. Rather than discipline, he was allowed to re-enlist (R. 261). In his words: "The general looked at the appeals and overturned them and then I was able to re-enlist, and this, this one will take me to 30 years of service to the country." (R. 261). He is currently helping out different food banks for operation Steady Resolve for the COVID 19 pandemic (R. 261).

Discussing Company policies, Fortney denied that he knowingly violated any policies. He asserted he was trained to be attentive when driving at work and in the military (R. 263-264). He asserted he has never been disciplined for negligence or safety issues at AT&T (R. 264).

Specifically referencing the accident, Mr. Fortney outlined his thoughts as follows:

Q.  When you were driving down that, bring yourself back to that day, I know, I know there's a lot of emotion in that, but when you were driving down Green Road, can you kind of recall those events for us?

A.  I was – I had already finished a job, I remember taking lunch after completing that job, hit the dispatch button on the iPad, it gave me, you know, my next job, and then you know, with the Google Maps, you know, plug in address, and then hit go, see where it takes you.  You know, turn up the volume on the iPad so that you can hear, turn left, turn right, go on this street or that street, and then you put that over in the passenger seat, turned upside down, and then made my way to my next job, took me onto Green Road, driving down that way, and I'm coming up to that area, and everything looked – nothing looked out of the ordinary, and just all of a sudden I see something out of my corner of my eye, person, and then I turned left to get out of the way, and it took me across the street to the sidewalk there.  I put my gearshifter in park, turned off the vehicle, took my seat belt off.  Another, another lady, I heard the lady's voice, she came over, I opened up my door, I heard, you know, "Are you okay?"  I said, "Yes."  I got out of the vehicle, and then I ran across the street, and then on the curd there –

Q.  Take your time.

A. – I saw the child.  I immediately, I immediately fell to me knees on the – in the street there, and I started crying.  The – I heard there was two other ladies around, next to the child, and I heard one of them ask for something to, you know, put over the child, so I got up, I ran back to my vehicle, and I had a, you know, sweatshirt, so I grabbed that and then brought that over, and there was another man, you know, he was, you know know, because there was still cars coming, going by, so then I ran back to get my cones to kind of block off the area there to have the cars go around, so forth, and then I went back to get my first aid kit, and then I could hear the sirens of the ambulances and police coming up.  So then I got on my phone and then I called my manager and then informed him, and then the police and EMS were on scene.

Q.  So you never once saw the person till the last second?

A. Yes.  *  *  *  I didn't see anything out of the normal coming around the curve.  (R. 164-166).

Mr. Fortney went on to discuss the punishment assessed by the Company:

Q.  And then lastly, Dan, do you feel that the discipline that the Company has given you in terminating your job is fair and just?

A.  I know that they have to, you know, discipline, and I understand the suspension, but not a full termination (R. 267.

During cross examination the Grievant elaborated that he did not see anything out of the ordinary when coming around the corner: "Coming around again, I came around the corner, I didn't see anything out of the ordinary, and then, like that, I saw, coming from the right, and then I jerked the wheel to the left."  (R. 269).

## D.     The Evidence Record Does Not Support the Company's Claim That the Grievant is guilty of "gross negligence"

Central to the Company's case is its allegation that the Grievant is guilty of "gross negligence."  See, *Brief for the Company* at 18 (and throughout).  Indeed, there is every indication that the Company treated this case like a *res ispa* case in tort law – that because a death was involved, the Grievant had to do something wrong. [10] As explained in this opinion, the evidence record does not support a finding a "gross negligence" by Mr. Fortney.

Cases like this, one of apparent first impression, assume a great variety of aspects and circumstances, making it difficult, if not impossible, to formulate a rule in language universally applicable to the next case.  *Sui generes* is the term often applied to cases like this.  As such, statements or rules of arbitral law in its application to one set of facts may be inaccurate or inapplicable when applied to another set of facts.  And so the parties find themselves between Ahab and his white whale, [11] where the outcome is problematic.

What is clear is this:  An accident may result from a hazardous situation solely caused by the defendant/grievant or by both the defendant and the injured victim.  When both parties are careless, they are usually, if not always, equally at fault; ordinary care on the part of either would prevent the injury.  See, *Nashua Iron & Steel Co. v. Worcester & Nashua R.R.*, 62 N.H. 159 (1882).

How does this affect the parties?

The Union asserts in its *Brief* at 7 "please consider the fact that it is plausible that this was a horrible tragedy *and no one was really at fault*." [12]  What is unknown in this case is

---

[10]     An exchange with company counsel and Ms. Todd, AT&T Area Manager for Central Office Operations,  makes the point:

> Q. [By Mr. Sferra]: You said that the Union said he [the Grievant] did nothing wrong.
> A. [By Ms. Todd]:  Right.
>
> Q.  How did you react to that?
> A.  I disagree with that.  If he had done nothing wrong, this wouldn't have happened.  A child died.  Something was done wrong.  He mentioned that he doesn't really know what happened, which is a concern, you know.  That would make me think that something happened that wasn't right.  (R. 183-184).

[11]     *Cf.* Herman Melville, *Moby Dick,* or *The Whale* (Bentley 1857).
[12]     The Union continues:

whether the death of the child is the proximate cause of negligence *exclusively attributed to the Grievant (underline exclusively)*. In another section of its *Brief* the Union points out that "the Company never considered the possibility that Ms. ████ may have contributed in this unfortunate accident in some way. Actually, they didn't consider any other possible explanation for the accident at all." (*Brief* at 18).

The mother, who did not testify in the arbitration proceeding (understandably so), arguably had a duty to look out for oncoming vehicles. It is not a reach to conclude that she may in fact have had a last chance duty to avoid the Grievant's vehicle. Did she look both ways before embarking from her location at point A to point B? **At best the employer has shown that the Grievant was a contributing cause of an accident that resulted in the death of a child and injury to his mother. To be sure, what is unknown in this case is whether the mother (with child in tow), by exercise of ordinary care, could have escaped injury to herself and her child.** If so, she cannot recover from her own injury, but may indeed be without a remedy against the Company and the Grievant. Bottom line here is this: The Grievant's conduct does not excuse the mother's obligation to exercise vigilance when entering an intersection, driveway, road, apron) or whatever). [13] Black letter law holds that he who by his

---

Ms. ████ was walking down the drive from her apartment towards the street. She had the same curve and obstruction that Fortney did. A blind spot may have been created. Is it possible that neither one saw each other? Is the answer that it was a horrible, tragic accident without blame? One that will deeply impact both lives forever? This may in fact be a possible explanation. (Brief at 7-9).

[13]     I have been through this record exhaustively, top to bottom. A fair reading of the transcript and exhibits, including the police report, results in an unclear conclusion of exactly where the accident took place. Was it is the middle of the street, as the drawings in the police report and witness statements suggest, or was it closer to, or even on, the curb/apron? Detective Nuti reported to the Company's investigator that Mrs. ████ was standing "in the apron" when she was hit by Mr. Fortney (R. 41-42). The record also supports a finding that Mrs. ████ was standing in the driveway (R. 54). "The truck was coming down the hill and it tilted from the right to the left, and then it struck them. * * * He hit the curb and then he hit the mother" (George Williams, R. 55, reporting what he observed on a video). Relevant here is the following exchange (often three way between the Arbitrator, Williams, and Counsel for the Company):

Q. [by the Arbitrator]: The witness said, "I saw the video, I looked at the video, and in my world, the truck hit the curb where the mother was, by the curb."
A. [By Mr. Williams]: Yes.

Q. She was not in the middle of the driveway?
A. She was in the, in the driveway.

Q. But at the curb, near the curb?
A. Yes. (R. 56-57).

* * *

Q. The video shows that the woman is on the sidewalk?
A. Yes.

Q. Once she got to the end of the sidewalk and walked across the driveway, what did you observe her do?
A. Stood there. She stood there. With the baby, holding the, holding the baby – the stroller.

Q. [By the Arbitrator]: So she got off the sidewalk and then walked in the driveway?
A. Yes.

Q. Across the driveway/
A. Right.

negligence has produced a dangerous situation is responsible for an injury resulting from it *who is without fault.* Whether the accident could have been prevented by the exercise of ordinary care of the mother is unknown, and this works in the Grievant's favor.

**In summary, based on the evidence record before me this is not a case involving "gross negligence" by the Grievant.** I agree with Grievant's counsel who asserted that if this had been a case of gross negligence, Mr. Fortney would have been charged with an offense much greater than the offense he eventually was allowed to plead to, conduct resulting in simple negligence in the *civil forum.* Far from a finding of "gross negligence," it is not at all clear that the Grievant did anything wrong in the sense he was acting below the standard expected of a reasonable person. Clear and simple this was an accident, truly tragic, but it would be nonsensical to work backwards and conclude there must be negligence because there was an accident. Again, this is not a *res ispa* case.

Supporting this view and reasoning is *Amalgamated Transit Union, Local 1395 & Escambia Area Transit*, 2006 Labor Arbitration Lexis 228 (Thomas Terrill, 2006). In that case a bus operator was discharged pursuant to a determination that she had a serious preventable accident that resulted in a pedestrian fatality. There was evidence that the pedestrian walked in front of grievant's bus. Significant here is the arbitrators' analysis of the issue of when an accident is "preventable." The Arbitrator, in reinstating the grievant with full back pay, adopted the Union's position (articulated in the opinion as follows):

> Simply because the accident of February 7, 2006 was "serious" since it involved a death does not mean that it was "preventable." A "preventable accident is one in which the operator failed to do everything he or she could reasonably do to avoid the accident." * * * Determinations of preventability must precede determinations of seriousness of an accident. If an accident is determined to be non-preventable, no discipline may be

---

Q. And while walking across the driveway, she got hit by the Grievant?

A. She stopped. She was standing there. And then all of a sudden the truck was coming down the hill there and struck the mother and the baby.

Q. Okay. And you know this from observing the video?

A. Yes. And also from the police report. (R. 57-58).

Grievant's personal lawyer stated that the accident took place at the edge of the driveway entrance to the Grande Point Apartments located at 1939 Green Road, although there is debate at to the location of the of the child's mother, as well as the location of stroller, as she was preparing to cross the street. "What was not in debate was the fact that the stroller and the decedent's body came to rest at the north most edge of the driveway entrance at 1939 Green Road, and that the body was resting almost equally in the street and in the driveway." (JX 13 at 25). Sight-line obstructions are present. Also, there are no crosswalks or pedestrian crossing signs. "A clear view of the driveway is only visible when a person is almost on top of it." (JX 13 at 26).

No question the Grievant's vehicle resulted in the death of a child and injury to the mother. However, this does not excuse Mrs. ▮▮▮ from her obligation to be on the lookout for oncoming vehicles at the edge of the driveway entrance before entering the street/intersection, and during her time in the intersection. Again, she did not testify and, accordingly, I don't know what her account is. She in fact may be blameless, but her account is completely unknown. This, along with the nature of the offense Fortney eventually plead guilty to (a non-criminal, traffic offense), and Judge Sweeney's letter to the military, precludes any finding that the Grievant was guilty of "gross negligence," or criminal negligence, as the Employer alleges throughout its *Brief* and at the hearing.

imposed. In this instance ECAT failed to meet its burden of proof by clear and convincing evidence that the Grievant had a preventable accident on February 7th.

The Arbitrator could not find the accident "preventable" and, accordingly ruled for the grievant bus operator.

The exchange between Union Counsel and Ms. Todd (*infra* this opinion at 34) regarding how Mr. Fortney was negligent renders it difficult, if not impossible, to conclude the accident was preventable.

### E.   Mr. Fotney's Plea to A Traffic Court Offense is not Comparable to Criminal, Gross, or Wanting and Willful Conduct

What of the result in the judicial forum?

When one judicial proceeding is followed by a second judicial-type proceeding, the usual rules of *res judicata* preclusion are applicable. Arbitrators have likewise applied concepts of *res judicata* preclusion. See generally, Marvin Hill & Anthony V. Sinicropi, *Evidence in Arbitration* (BNA Books, 1991)(Ch. 19, discussing prior arbitration awards). As stated by Owen Fairweather, when a prior arbitrator has rendered an award in a dispute between the same employer and the same union, the precedential effect of the prior award moves from that of *stare decisis* to that of *res judicata*. Fairweather, *Practice and Procedure in Labor Arbitration* 573 (BNA Books, 1983)(2d ed.). Hill & Sinicropi have submitted that arbitrators have recognized and applied *res judicata* concepts where the same parties are involved and the same claim or issue was presented in an earlier arbitration or before an earlier court proceeding. In such cases it is often held that adherence to prior awards and court decisions is desirable for maintenance of stable labor-management relations, for finality, and for consistency in contractual interpretation. As stated by one arbitrator: "But where, as here, the prior decision involves the interpretation of the identical contract provision, between the same company and union, every principle of common sense, policy, and labor relations demands that it stand until the parties annul it by a newly worded contract provision. 9 LA (BNA) 731 (McCoy, 1948), as cited in Hill & Sinicropi, *supra*, at 391.

Under this evidence record the Grievant's plea has little *res judicata* effect in this proceeding. A neutral judge characterized the Grievant's guilty plea as a "legal fiction," [14] and I

---

[14]    The Grievant pled guilty to "Operation in Willful and Wanton Disregard of the Safety of Persons or Property *with 2 or more Priors (4511.20 M3)*" after consulting with his Attorney. Mr. Fortney testified that he was present at court when the plea was read. Significantly, the Grievant testified he did not have two priors (R. 248), which in my world takes the plea out of any *res judicata* consideration regarding the Grievant's ultimate culpability. As summarized by Mr. Jay Crook, Esq, Grievant's Attorney, in a letter to MG Steven Rhodes and Chief O Major Adam. II Stephen Leonati:

   The final resolution [the misdemeanor guilty plea] came about as a result of a legal fiction. The prosecuting attorney required that MSG Fortney plead to the equivalent to a misdemeanor of the third degree. The reckless operation with a stipulation to two prior violations was the agreed-upon charge after months of negotiations. To be perfectly clear, Master Sergeant Fortney did not have any previous convictions for reckless operation of a motor vehicle. **The charge was arrived upon to allow Master Sergeant Fortney to put an end to two years of uncertainty an-d allow him to plead to a charge that did not include any allegations of the criminal taking of another's life while at the same**

credit the declarations of Judge Sweeney who, in a letter to Stephen Rhoades, Brigadier General,
OHARNG, Commanding (UX 13 at 1), concluded:

> As I am unaware of the civil lawsuit findings, I cannot comment on proximate cause or
> foreseeability.  However, it is questionable whether there was any breach of duty, as no
> alcohol, drugs, speed, cell phone or tablet were at issue, per my understanding of the
> evidence discovered.  **The plea arrangement took this case out of the Ohio Revised
> Code Criminal section and amended it to an Ohio Revised Traffic Offense.**
>
> **The plea and sentence were agreed to by the parties, and the plea appears to be a
> legal fiction, as viewed from Mr. Fortney's driving record with the Ohio Bureau of
> Motor Vehicles.**

Further Judge Sweeney wrote:

> This Honorable Court does not understand how Mr. Fortney demonstrated a serious lapse
> in judgment or discredited himself.
>
> (UX 13 at 1).

**While the matter in the judicial forum is not *res judicata* in the arbitral forum, still
the fact that the Grievant was not convicted of a crime, nor did he enter a plea to a crime, is
noteworthy and works in his favor.**  Accord: *The King Company*, 89 LA (BNA) 681 (Bard,
1987)(sustaining grievance of employee suspended for off-duty vandalism of co-worker's
vehicle and lying during investigation, reasoning: "It cannot be stated too strongly that the results
of criminal proceedings submitted to an arbitrator whose selection and authority derive solely
from the provisions of the collective bargaining agreement are not binding upon the Arbitrator,
any more than are the findings of a commission authorized to make a determination as to
whether a discharged employee is entitled to unemployment benefits.  The overwhelming body
of opinion is that the existence of criminal proceedings collateral to an arbitration hearing have
no necessary consequences in an arbitration). [15]

---

**time meeting the prosecution attorney's requirement that Master Sergeant Fortney plead to a misdemeanor of
the third degree.** The fact that the prosecuting attorney did not demand Master Sergeant Fortney plead to a criminal
act, the reckless operation charge is a violation of the traffic code, nor to admit to any culpability for the death of the
young boy who lost his life is a clear showing of the lack of confidence in the ability to convict Master Sergeant
Fortney. (R. 250-251; UX 13 at 28; emphasis in bold mine).

[15]    I doubt in the result in *The King Company*, a case submitted by the Union, represents the better weight of arbitral case
law, although the declaration regarding the effect what goes on in a criminal forum is representative of arbitral case law with
respect to *claim preclusion* as opposed to *issue preclusion*. See, Allen Vestal & Marvin Hill, Preclusion in Labor Controversies,
35 Oklahoma Law Review, pp. 281-372 (1982)(lead article).

**F.**     **The Grievant's Sterling Driving and Military Record, and Letters of Support from Servicemen, Current and Past, is Relevant to a Remedy Consideration**

Further supporting the Grievant's case is his military record and reenlistment, even after the accident.  What an employee does on and off duty is relevant to a reinstatement decision, especially after a serious accident that may call into question the employee's professionalism and overall stability in decision making.  To this end, Mr. Fortney was selected for retention "after 26 years for faithful and honorable service by recommendation of the Qualitive Military Retention Board."

I am allowed to take judicial notice of all things reasonable and known to most individuals. [16]  Individuals of problematic character, as evidenced by immoral or criminal conduct, would not be allowed to serve in any capacity in the military.  Grievant produced numerous recommendations regarding his military service and, notwithstanding the accident, was permitted to reenlist.   Although his military record is not dispositive of the grievance, it is evidence of Grievant's good character and devotion to duty, honor and country.  More importantly, it goes to the issue whether he can be a trusted and dedicated AT&T employee in the future.  Refreshing is it to read outstanding letters of reference by military colleagues and Mr. Fortney's influence on their lives. [17]  See, *Local Union 430, Utility Union of America & Ohio Valley Electric Corporation, Kyger Creek Station*, 2010 Labor Arbitration Lexis 61 (Langdon D. Bell, 2010)(reversing termination of employee discharged for punching another employee; interesting and significant here is the Arbitrator's ruling that the administration of industrial discipline cannot hang on a popularity contest involving the disciplined employee, "the instant grievant was amenable and well-liked by his fellow bargaining-unit members and supervisors alike.")

Then there is the issue of the Grievant's driving record.  The evidence record indicates that the Grievant is without any accidents or discipline during his 17-year career and none since the issue in question.  I credit the Union's argument that based on his 17-year record with AT&T and thereafter, it is improbable that a similar accident will happen (See, *Brief for the Union* at 7).  **This is not a case of an accident-prone employee who is a risk to the Company's operations or an employee who is a problem worker.**

---

[16]     Judicial notice is a rule in the law of evidence that allows a fact to be introduced into evidence if the truth of that fact is so notorious or well known, or so authoritatively attested, that it cannot reasonably be doubted. Facts and materials admitted under judicial notice are accepted without being formally introduced by a witness or other rule of evidence, and they are even admitted if one party wishes to plead evidence to the contrary. See, Hill & Sinicropi, *Evidence in Arbitration* (1989)(second edition)(discussing judicial notice).

[17]     I have been hearing cases since 1976. The declarations regarding Mr. Fortney's military leadership skills are "off the curve" on the good side. Declarations such as "citizens are lucky to have this type of person serve the state" (Adam Yoho), "he has put his soldiers and the needs of the OHARNG and Army above his own many times throughout his career" (Benjamin Kot) and "I have never in my 13 years of service even seen an NCO, or leader, care for soldiers as much as MSG Fortney does. I didn't have to work about the wellbeing of our soldiers when he was around, because there was no way that a soldier wasn't being taken care when he was around" (Harvey Studer, Jr.) are impressive squared and indicative of a professional mindset, important to the Grievant's future endeavors.

**G.     The Union's Argument Regarding an Inadequate Investigation by the Company is Rejected**

     **What of the Union's case involving the adequacy and fairness of the investigation?** Interestingly, the reporting services publish numerous cases where arbitrators have commented on an employer's investigation.     See, e.g., *Heritage Manor Health Care Center & United Steelworkers of America, District 33, Local Union 7090*, FMCS Case #93-08787, 1993 BNA LA Supp. 102120 (Bard, 1993)("A faulty and inadequate investigation often results in faulty and inadequate proof, as is seen in this case.  A thorough investigation many times can elevate assumptions and suspicions to the status of proof, avoid reliance on hearsay and other 'lightweight' or 'nonweight' evidence."  Significantly, Arbitrator states: "Had the discussion gone on prior to that time she would have been able to better adequately respond to these charges.  *At no time was she given the right to confront her accusers during the investigative process or to defend herself in any meaningful way.*  Had she been properly asked the Grievant could have provided vital information to the Employer regarding the background of what occurred, who initiated conversations, and what had occurred with nursing assistant prior to the first conversation between the patient and the Grievant.");  *In The Matter of Arbitration Between Union and Employer (Discharge of E)[number redacted]*, 2014 BNA LA Supp. 165756 (McEneaney, 2014)(sustaining termination; Arbitrator points out that the grievant was allowed to give her side of the story many times prior to her dismissal);  *King Soopers, Inc. & United Food and Commerical Workers Union, Local 7*, 88 BNA LA 254, 262-263 (Sass, 1985)(investigation should have included early communication with the grievant to obtain her side of story;  **Arbitrator also points out that "an investigation, to be worth anything, must consider and uncover evidence on both sides of an issue, not just one side.");**  *Employer and Service Employees Union, Local ___ [number redacted]*, 2011 BNA LS Supp. 149367 (McGinnis, 2011)(stating "A fair investigation must also be a thorough, fair and objective investigation.");  *Police Association, State Coalition of Police, Local ___ and Employer [number redacted]*, 2012 BNA LA Supp. 149114 (Boulanger, 2012)(case dealing with an officer's failure to conduct a proper investigation;  Arbitrator notes that officer/grievant was accorded opportunity to present his side of story *before termination decision was made*, concluding "Town officials considered grievant's input before it disciplined him.");  *United States Postal Service & National Association of Letter Carriers*, 89 BNA LA 495 (Dennis Nolan, 1987)("There is simply no excuse for failing to seek the employee's side of the story before discharge."  Arbitrator concludes that employer owed the employee "at least a chance to defend himself.");  *City of Pharr, Texas & Combined Law Enforcement Association of Texas*, 127 BNA LA 1025 (Jennings, 2010)(outlining three requirements for a fair investigation: "(1) *the investigation must normally be conducted before the disciplinary decision is made;* (2) the employee under investigation should be suspended with the understanding that if found innocent, the employee will be restored to his/her job with full pay for all lost time; and (3) the actual investigation must be conducted in an objective manner in which relevant information is not excluded.");  *AFSCME, Local 536 & City of Chisholm*, 1993 BNA LA Supp. 114664 (Neigh, 1993)(reinstating employee, concluding that employer's treatment was employee was "unconscionable"; Arbitrator declares:  "Common decency requires some effort to ascertain the facts and circumstances before taking such a drastic step as assuming that an employee has voluntary quit.");  *Marlo Graphics , Inc. & Graphic*

*Communications International Union, Local 505-M*, 1997 BNA LA Supp. 104063 (Draznin, 1997)("Due process, including prior notice, an opportunity to be heard and a perception of fairness, is inherent in the concept of just cause. An investigation is useful for more than fact finding. It allows all involved parties to an incident to provide input to management to remove possibilities of arbitrariness and insure that the resulting discipline can be made to 'fit the crime' One of the things an investigation also does is notify everyone that some disciplinary action relating to the given incident is being considered. Although it doesn't cushion the blow, necessarily it does at least give a little warning that one might come. It also often serves to justify an extended period between an incident and a determination of disciplinary action."); *IL FOP Labor Council & Christian County Sheriff's Department*, 2001 BNA LA Supp. 114886 (Winton, 2001)(reinstating grievant police officer, finding investigation faulty. Arbitrator reasons: "The County's handling of this termination is faulty in a number of ways. It did not allow a Union representative to be present when the grievant was discharged; it did not really do a pre-discharge investigation and discuss with the Grievant and allow him to reply; and it did not follow progressive discipline as it is commonly known as it is specifically noted in the contract."). An employer that does not include a statement from the grievant, or the opportunity to make a statement, before imposing discharge almost always results in a ticket back to work for the grievant. This is not Marvin Hill's sense of his own notion of industrial justice but, as indicated in the above citations, reflects the better weight of arbitral authority.

**To AT&T's credit, the Company ascertained Mr. Fortney's version of the facts before electing to terminate his employment. Moreover, the Company sent Ron Williams to investigate, although his results were anything but exhaustive by the Union's standards (his 35 minutes on the scene is problematic)(R. 46). Still, the Union cannot be faulted for pointing out that it appears that management relied excessively on the police report. [18]**

**While the company's investigation could have considered other theories, especially of causation, as well as the Union's concerns with obstructions and Ms. ▮▮▮▮▮ culpability, I don't see the company's investigative efforts as requiring a decision for Mr. Fortney on this basis only. It is not at all uncommon for employers to rely extensively on police reports, especially public-sector employers. I see no infirmity in the Company's investigative efforts in this case.**

**H.    The Union's Disparate Treatment Argument is Rejected**

**Finally, without comment or discussion, I reject the Union's contention that the Company engaged in disparate treatment, as that term is traditionally used, regarding its treatment of the Grievant.**

---

[18]        I arbitrate police and firefighter cases, and this much is clear black letter law: once police reports are generated, everyone relies on them – other police departments, plaintiffs, defendants, insurance companies, and media personnel. Hearsay objections are not sustained even though, technically, what is in the report is lots of hearsay (statements of witnesses, for example). I find no infirmity in the Company's reliance on a police report.

**Summary and Final Observations**

**Where does this evidence record leave the Grievant?**

In its lengthy *Brief*, Counsel for the Company points out that "consistent with the discretion afforded under the Manager's Guide to escalate discipline based on the severity of an offense, Ms. Terra Todd and Mr. Richard Plant determined dismissal was warranted because in their view "the Grievant's preventable MVA resulted in a fatality and another serious injury." (*Brief for the Company* at 14).

Management cites Mr. Plant's "talking points" summarizing its policies the Grievant arguably violated by what management characterized as "his grossly negligent misconduct." They are as follows:

**(1) TFS Technician Expectations;**

**(2) EH&S policies (delineated in the Manager's Guide), and**

**(3) COBC (R. 128, 135; JX 3; CX 5).**

Mr. Plant summarized the findings underlying the SPT decision, i.e., the Grievant "was driving his Company vehicle on Green Road, he left the road, based on the evidence in the police report, and [] the AP report, struck the baby, killing the child and gravely injur[ed] the mother." See, *Brief for the Company* at 15. Mr. Plant then read his talking points verbatim, summarizing the policy violations:

**2017 TFS (Technical Field Services) Technician Expectations**

[Citing CX 6]: Page 1, #14: "Employees must follow all defensive driving expectations, including but not limited to, reporting to work, driving on company business or driving a company vehicle while under the influence of alcohol or any drug is forbidden." (The drug/alcohol part does not apply, but following all defensive driving expectations does apply.)"

Page 5 (under the heading of Make Environment, Health and Safety a Priority): "Follow all EH&S policies and guidelines." This refers us back to the Defensive Driving Job Aid and the class Fortney completed. Under this same heading, #5 states; "Drive Defensively."

**Under Safety (Manager's Guide)**

Preventable Accident is defined as when: "The employee failed to follow a company policy, practice procedure and/or the law in cases of motor vehicle accidents for which discipline is commonly imposed in the absence of an accident or did not take clearly reasonable steps to avoid hazards when failure to take such steps would commonly result in discipline in the absence of an accident. The violation of policy and/or law is either willful disregard or a negligent act.

**COBC Violation**

Page 3 of 11 on the 2017 COBC:

33

[Citing CX 8]: Under the heading of "We create a safe and secure place to work," it states "the importance of working safely has been a part of our heritage for over a century. We promote safety to protect our workforce and our customers. When safety is at issue, we take reasonable precautions to safeguard the public, as well as our employees and customers."

Under the section on Reporting On and Off Duty Misconduct; it states, "employees should strive to avoid misconduct that could impair work performance or negatively affect the Company's reputation or business interests. Regardless of whether it is covered by the reporting requirements below, fraudulent or other unlawful misconduct committed on or off the job that could effect the Company or an employee's work may provide grounds for disciplinary action up to and including termination. (See, CX 5; R. 129-30, 133, 136-37; CX 4-8; Brief at 16). [19]

Tarra Todd testified as to the Company's emphasis on safety, that employees are instructed to do one thing, pay attention to the task at hand "and focus on that one thing, whether its driving, that's their primary job at the time, if it's climbing a ladder, that's the only job they have at the time. Safety is my number one priority." (R. 178). Todd correctly noted that the Company has the right to escalate discipline based on the severity of what happens (R. 180). "If something is severe enough and the circumstances call for it, we can escalate." (R. 180-181). Todd ebalarated that based on the severity of the Grievant's accident "and the negligence of Dan when he was driving and the fact that it resulted in a death, I did not think it was layering, I thought it was a severe enough infraction that it required us to terminate." (R. 183). She indicated it did not matter to her where the victim was standing when the accident took place (R. 183). In her words "Whether you are standing in the street or not, you should avoid any person that you see." (R. 183). She continued to treat the accident as a res ispa case: "If he had done nothing wrong, this wouldn't have happened. A child died. Something was done wrong. He mentioned that he doesn't really recall what happened, which is a concern, you know. That would make me think that something happened that wasn't right." (R. 184),  Ms. Todd continued to maintain "this showed negligence. It was more than a traffic ticket." (R. 185). Her concern, she declared, was "if he doesn't know what happened, how would we prevent it from happening again?" (R. 185).    Todd denied getting any pressure to terminate for racial reasons (R. 185).

Asked if this was an easy decision for her, she responded "No, not at all." (R. 186). Her explanation is noteworthy:

> My heart went out to Dan. I don't believe that Dan went out that day and decided, you know, to have this happen. Dan's history with the company, his remorse,

---

[19]    As outlined in the Company's Brief at 16:

> The Union asserted several responsive claims in an effort to mitigate discharge. Its main claim was that "the standard discipline, per the Manager's Guide [], is a written warning [and a] one day [suspension]." (R. 140). The Union representatives conceded at the Dismissal Panel that the Company "could escalate if [it] want[ed]," but claimed termination was not warranted. (R. 140). The Union also asserted termination was not appropriate based on its speculation that Ms. ▮▮▮▮ "could have been" standing in the street at the time of the accident and not on the driveway's apron. (Tr. 139).

his history with the armed forces, his service to the country, the letters he showed us, you know, it was just a really sad circumstance, but with that being said, I personally owe it to the public, to our customers, and to our employees, to provide as much safety as I possibly can in my control.  And I didn't, and don't believe that having Dan driving a vehicle or, you know, working here is doing that (R. 186).

Mr. Todd testified she was unaware of any such cases in her 19 years with the Company where an employee driving a company vehicle resulted in a fatality (R. 187).

Direct and significant evidence that at all times the Company treated this case like a *res ispa* case ("the thing speaks for itself"), is an exchange between counsel for the Union and Ms. Todd:

> **Q. [By Mr. Passalacqua]: What did he do that was negligent?  Aside from having the accident?**
> **A. [By Ms. Todd]: He hit a child and mother.**
>
> **Q. Aside from that.  What action did he do that was negligent?**
> **A. I understand what you're asking, but that is what he did that was negligent.  There is no besides that.  That's what he did.**
>
> \*   \*   \*
>
> Q. Understanding that this is a horrible accident, do you believe that sometimes no matter how much you – how hard you try, accidents do, on occasion, happen?
> A. Yes (R. 187-189). [20]

---

[20]   A last note is in order.  There is a parallel here to DUI cases.  Two individuals drive a car while intoxicated.  One is stopped for speeding and the other in involved in an accident involving the death of a passerby. The speeding person is allowed to enter court supervision (on a first offense) with no consequence, while the other individual goes to jail.  The infirmity, the offending conduct, is driving while under the influence, notwithstanding the end result.  The offenses are arguably the same.  Our legal system, however, treats the two cases differently based on the result.  And with good cause.

Aside from the results of Mr. Fortney's accident, the Company never outlined exactly what the Grievant did wrong the day of the accident.  He wasn't drinking or otherwise under the influence, on a phone or an iPad, speeding, or operating his vehicle in a reckless manner.  What Ms. Todd and AT&T point to are the results of the accident – a dead infant and injured mother, concluding that Mr. Fortney must be at fault because in Ms. Todd's words: "he hit a child and mother" and "that is what he did that was negligent." (R. 188).  And I get where they are coming from, except it ignores the fact that, just maybe, Mr. Fortney was doing everything correctly that September day and just maybe Ms. ▮▮▮▮ was not paying attention to her surroundings that day.  To her credit even Ms. Todd conceded the point on cross examination:

> Q. Has there ever been times in your time that you have supervised individuals driving that people have had accidents that was found to have been preventable where the technician did everything right, didn't violate the policy, and no actions were taken?
> A. Yeah. (R. 190).

It is difficult to conclude the Grievant was operating his vehicle in an unsafe manner, or was otherwise not attentive, *independent of the tragic results*, although the Grievant's inability to explain with specificity what happened really placed the Company between Ahab and his white whale.

To his credit Mr. Fortney recognized that some discipline was appropriate (presumptively under the above outlined mandates), but not a permanent separation. I agree. Although this evidence record cannot support a finding of gross or criminal negligence, there is enough in the record to support a disciplinary suspension, but not a termination. See especially, *Akron Beacon Journal Publishing Company*, 85 LA (BNA) 314 (Lawrence Oberdank, 1985) and *Akron Beacon Journal Publishing Co. & Newspaper Delivery Drivers, Local 473, IBT*, 85 LA (BNA) 314 (Lawrence Oberdank, 1985)(discussed *supra* at 19; both cases resulting in reversal of terminations).

For the above reasons the following award is issued:

## I.     AWARD

The grievance is sustained in part and denied in part. The Grievant's discharge is converted to a 60-day suspension. Mr. Fortney will otherwise be made whole and reinstated to his former position or similar employment at AT&T Cleveland, Ohio, with make whole relief, less the time lost from a suspension, and less any interim earnings and income received from unemployment.

Jurisdiction is retained in the event the parties are in dispute as to what is owed the Grievant.

Dated this 21st day of January, 2021, at
DeKalb, IL, 60115.

Marvin Hill,
Arbitrator